Filed 5/21/26  P. v. Valenzuela CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE , <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARIO ALBERTO VALENZUELA, <br><br> Defendant and Appellant. | F089200 <br><br> (Super. Ct. No. 20CMS-1621) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Marianne Gilbert, Judge.

Denise Marie Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted Mario Alberto Valenzuela (appellant) of battery by a prisoner on a nonprisoner (Pen. Code, § 4501.5), [1] and appellant admitted three prior strike conviction allegations (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). The trial court sentenced him to an indeterminate term of 25 years to life in state prison.

On appeal, appellant contends the prosecutor committed misconduct during closing argument and that the trial court erred by failing to dismiss his prior strike convictions pursuant to section 1385, subdivision (c). We reject both contentions and affirm.

## BACKGROUND

### I. Prosecution Evidence.

In June 2019, appellant was incarcerated at Corcoran State Prison. Christian S. was employed at the same institution as a correctional officer.

#### A. *June 5, 2019, Incident.*

On the morning of June 5, 2019, two correctional officers escorted appellant from his cell to a mental health group meeting. The officers testified that appellant was handcuffed but not in leg restraints. As they proceeded to the meeting room, they encountered Christian S., who was standing in a hallway. Without warning, appellant stepped forward with his left leg, then kicked with his right leg, striking Christian in the upper thigh area. According to the officers, Christian was "just standing there" and did not say or do anything to provoke the assault. The officers immediately took appellant to the ground, where he continued to thrash and kick until they succeeded in gaining control of him.

Christian S. testified that he was assigned that morning to escort inmates to their mental health appointments. After several inmates declined to attend, he went to a

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

hallway and waited. While he was standing there, appellant kicked him in the upper left thigh. Christian explained that he had no prior history with appellant, did not know who he was at the time, and had no idea why appellant kicked him.

Christian S. testified the kick caused pain and redness to the area of contact but did not result in further injury. Another officer took a photograph of Christian's lower body, which depicted dirt on his pants in the area of contact. No photograph of the actual injury was taken.

B.     *June 22, 2019, Incident.*

On the morning of June 22, 2019, Christian S. and correctional officer Jaime A. were assigned to collect breakfast trays from inmate cells following the morning meal. Christian testified they approached cell number 8, which was solely occupied by appellant. After opening the food port in the door of the cell, they instructed appellant to place his tray on the port, and he complied. When Christian reached for the tray, appellant suddenly thrust his right arm through the food port and began making slashing motions. Christian could see appellant was holding something in his hand but could not determine what it was. Appellant struck Christian's wrist and palm area, penetrating his glove and causing a laceration approximately three to four inches in length. Christian covered the wound with a paper towel to control the bleeding and sought medical treatment at the prison's medical clinic, followed by treatment at a local hospital.

Jaime A. testified he saw appellant thrust his hand through the food port and make slashing motions toward Christian S. Immediately after the assault, Christian attempted to back away from appellant's cell, but a food cart blocked his path. In response, Jaime deployed a burst of pepper spray into the cell through the food port. Appellant stepped back from the cell door, and Jaime saw him throw an unknown object into the toilet and heard the toilet flush.

Jaime A. activated an alarm, and several correctional officers responded. Appellant complied with orders to place his hands through the food port and was

handcuffed, but when officers opened the cell door, he pushed off the wall with his foot and lunged at an officer. The officer used appellant's momentum to take him to the ground, causing him to strike his face on the concrete floor. Appellant continued to resist, thrash, and kick, repeatedly stating, "[M]otherfucker, … I got your fucking ass." The officers did not locate a weapon.

On cross-examination, defense counsel asked Jaime A. if there is a "procedure at the prison when contraband is thrown in the toilet." Jaime responded there is no practical procedure for recovering contraband once an inmate, still inside the cell, begins flushing it. Although staff have the ability to shut off the water, doing so requires obtaining a key and accessing a lever behind a secured door. In this case, the water was not shut off because there was insufficient time.

## II. Defense Evidence.

### A. *In-custody witnesses*.

Appellant called three in-custody witnesses, each of whom testified he was housed in the same area as appellant at Corcoran State Prison in June 2019 and knew appellant by the nickname "Huey."

D.P. described two incidents involving appellant in June 2019. The first incident occurred in a hallway. According to D.P., he was speaking with a doctor when he heard a commotion and, upon looking over, saw appellant fall forward. Christian S. and another correctional officer then kneed appellant in the back and slammed him to the ground. He did not observe the events leading to the incident.

The second incident occurred later in the month while D.P. was in his cell, which was located two to three cells from appellant's. He testified that, during tray collection, he observed several correctional officers outside appellant's cell. After hearing one of the officers make a comment, he saw the officers open the food port and deploy pepper spray into the cell. He further testified he heard appellant ask, "[W]hy are you spraying me[?]," followed by the activation of an alarm. D.P. testified that several officers,

4.

including Christian S., removed appellant from the cell in handcuffs, struck him, forced him to the ground, and that one officer used leg irons to "choke" appellant. He acknowledged he lacked a direct view of the entire incident but claimed he observed it through a reflection in a rolling plexiglass shield used by officers when deploying "gas" into a cell. He later observed bruising and blood on appellant's face and saw him wearing a neck brace. He also claimed appellant never flushed his toilet.

D.P. admitted prior convictions for kidnapping, rape, robbery, and criminal threats. He also admitted prior convictions for assaults on correctional officers, including a 2019 conviction for aggravated mayhem against a correctional officer.

Rudy J. testified he was housed in the same building as appellant, but on the upper tier. Sometime in June 2019, he heard commotion on the bottom tier while he was in his cell. Although he did not have a direct line of sight, he claimed he was able to observe the area in front of appellant's cell through a reflection in the angled glass of the guard tower. Through that reflection, he saw a correctional officer order appellant to get on his knees, and appellant complied. The officer then wrapped a chain around appellant's neck and pulled him to the ground. Other officers began striking appellant while ordering him to stop resisting, then deployed pepper spray. The officers then dragged appellant back into his cell and continued to strike him.

Rudy J. admitted multiple prior convictions, including several for assaults committed in prison, as well as a 2008 conviction for assault with a deadly weapon.

T.A. testified he was housed in a cell next to appellant's. He claimed correctional officers regularly assaulted appellant in his cell, which he could hear and observe through a small hole in the wall. On one occasion in June 2019, several officers went to appellant's cell to retrieve his food tray. He testified that the officers, including Christian S., then began assaulting appellant in front of the cell, leaving him injured and bleeding.

T.A. admitted three prior convictions for robbery.

**B.** *Appellant's testimony.*

Appellant testified he has been an inmate at Corcoran State Prison for about 20 years. On June 5, 2019, he was escorted from his cell to a group meeting room while restrained in handcuffs and leg irons, which he testified were required due to his prior assaults on staff. A photograph admitted by the defense showed a placard on the front of his cell indicating this restriction. As appellant proceeded to the meeting room, he encountered Christian S. in a hallway. According to appellant, Christian stated, "[S]o you like to assault staff," then tackled him to the ground and punched and kneed him in the face. Appellant denied kicking Christian, claiming it was impossible to do so because of the leg restraints.

Regarding the June 22, 2019, incident, appellant testified that he was in his cell during tray collection when Christian S. approached and called him a "punk ass snitch." Appellant believed the remark was directed at the administrative complaint he had filed regarding the June 5 incident. According to appellant, Christian then deployed pepper spray through the food port, prompting him to grab a blanket to try to block the spray. Several correctional officers entered his cell, placed him in handcuffs and leg irons, and one officer attempted to strangle him using a separate set of leg irons. The officers then removed him from the cell, where Christian struck and kicked him until he lost consciousness. When he regained consciousness, he was back in his cell, where officers continued to strike him and deploy pepper spray.

Appellant testified he was subsequently taken to an outside hospital, where he was diagnosed with a concussion, rib fractures, and a sprained neck. Photographs were admitted showing appellant in a neck brace with abrasions and bruising to his face, chest, and shoulder.

Appellant denied cutting Christian S.'s hand or possessing a weapon. He claimed that correctional officers had access to a lever between his cell and the neighboring cell

6.

that allowed them to shut off the water and recover any contraband that had been flushed down the toilet.

Appellant admitted several prior convictions, including attempted murder, robbery, burglary, assault with a deadly weapon, battery with serious bodily injury, and assault by a life prisoner. He also acknowledged a prior assault on correctional officers.

## C. *Prosecution rebuttal evidence.*

A correctional sergeant testified that prison records showed T.A. was not an inmate at Corcoran state prison on June 22, 2019, and was not transferred there until July 2019. The sergeant also confirmed that appellant was sent to an outside hospital following the June 22, 2019, incident.

Christian S. testified that no plexiglass shield was present in the area of appellant's cell on June 22, 2019. He further testified that it is not possible to observe the lower tier from the upper tier through reflections in the guard tower windows.

## PROCEDURAL HISTORY

In the second amended information, the People charged appellant with two violations of battery by a prisoner on a nonprisoner (§ 4501.5), one occurring on June 5, 2019 (count 1) and the other on June 22, 2019 (count 2). The People also alleged 10 prior strike convictions. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).)

Before the jury returned its verdict, appellant admitted three prior strike conviction allegations: a 2009 conviction for attempted murder (§§ 664, subd. (a), 187, subd. (a)), and two 2017 convictions for attempted murder. The trial court granted the People's motion to dismiss the remaining seven prior strike conviction allegations.

The jury found appellant guilty on count 2, but not guilty on count 1. At sentencing, the trial court denied appellant's request to dismiss his remaining prior strike convictions pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). The court then sentenced appellant to an indeterminate term of 25 years to life

in accordance with the "Three Strikes" law, to run consecutive to his existing sentence.[2] (See §§ 667, subd. (e)(2)(A)(ii), 1170.12, subd. (c)(2)(A)(ii).)

## DISCUSSION

### I. The Prosecutor Did Not Commit Misconduct During Closing Argument. Defense Counsel's Failure to Object Was Not Ineffective Assistance.

Appellant contends the prosecutor committed misconduct during closing argument. He asserts the prosecutor misstated the evidence, urged the jury to consider extraneous matters unrelated to guilt through inflammatory rhetoric, impugned the integrity of defense counsel, and expressed a personal belief in appellant's guilt. Although appellant concedes no objection was raised below, he contends defense counsel's failure to object amounted to ineffective assistance. We conclude prosecutorial misconduct did not occur, and thus, counsel was not ineffective for failing to object.

#### A. *Background*.

During closing argument, the prosecutor made the following statements that appellant contends amounted to misconduct:

> "All that evidence alone should be enough to give a reasonable person an abiding conviction that the charge is true. But -- and precisely for that reason [appellant] has come prepared with a team of his homies that are trying to play you. They are trying to deceive you into trying to keep [appellant] from being convicted for cutting [Christian S.'s] hand through the food port that day.
>
> "And, now, I'm going to address the evidence that the defense put on and I'm going to try to explain to you why their conspired -- their collective lie or story is so ridiculous. The very fact that they would go to the length to try to present that to you is actually further evidence that they

---

[2]     Although appellant's current offense (§ 4501.5) does not qualify as a serious or violent felony within the meaning of sections 667, subdivision (c), and 1192.7, subdivision (c), he was nonetheless subject to a 25 years to life sentence because his prior strike convictions were for attempted murder. (§§ 667, subd. (e)(2)(C)(iv)(IV), 1170.12, subd. (c)(2)(C)(iv)(IV); see *People v. Johnson* (2015) 61 Cal.4th 674, 681–682.)

know [appellant] is guilty and that they are putting forth that story to try to play you."

[¶] … [¶]

"But that's exactly what's happening from the defense here. Four inmate homies are trying to play you. That's what they do. You remember the convictions that the other witnesses admitted to. These people have made a profession out of trying to game the system and I'm asking you simply to use common sense, to use reason and all the evidence admitted in this trial and not to let yourselves be played by that because it's been, admittedly, over five years, but justice late is better than justice denied. And based on the evidence in this case I'm asking you to find [appellant] guilty as charged in [c]ounts 1 and 2."

Later, during rebuttal, the prosecutor stated:

"Now, next, counsel has talked quite a bit about how staff could have turned off the plumbing to retrieve the blade. Well, actually, what is the evidence admitted in this case of that? He did not have anyone from the prison testify that that actually was a procedure, that that actually was something that could have been done to retrieve the blade. The only person who testified to that was [appellant]."

## B.     *Standard of review.*

Prosecutorial misconduct occurs when " '[a] prosecutor … uses deceptive or reprehensible methods to persuade the jury." (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "When a claim of misconduct is based on the prosecutor's comments before the jury, … ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

"To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at

9.

p. 305.)  Appellant concedes defense counsel did not object to the alleged misconduct but contends defense counsel's failure to object constituted ineffective assistance.

To prevail on an ineffective assistance of counsel claim, the claimant must establish counsel's performance fell below an objective standard of reasonableness, and that prejudice occurred as a result.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)  The claimant has the burden of showing both deficient performance and resulting prejudice.  (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

C.     ***The prosecutor did not engage in misconduct during closing argument.***

We conclude appellant's various assertions of prosecutorial misconduct during closing argument are without merit.  Accordingly, defense counsel did not render ineffective assistance for failing to raise meritless objections.  (See *People v. Ochoa* (1998) 19 Cal.4th 353, 464; *People v. Jones* (1998) 17 Cal.4th 279, 309.)

**1.     The prosecutor did not appeal to extraneous matters or employ unduly inflammatory rhetoric.**

Relying on *People v. Sanchez* (2014) 228 Cal.App.4th 1517 (*Sanchez*), appellant contends the prosecutor engaged in misconduct by repeatedly arguing that appellant and the in-custody witnesses were attempting to "play" the jurors and deceive them into acquitting him of the offense charged in count 2.  He asserts the argument was inflammatory and improperly appealed to considerations extraneous to guilt by suggesting that any juror who returned a not guilty verdict would be "a fool who let themselves be played."

In *Sanchez*, the prosecutor argued that the defendant "hopes that 'one of you' will be 'gullible enough,' 'naïve enough,' and 'hoodwinked' by the defense arguments so that he 'can go home and have a good laugh at your expense.' "  (*Sanchez, supra*, 228 Cal.App.4th at p. 1529.)  The court held these remarks were improper because they were "designed to offend and intimidate the potential holdout juror who doubted [the] defendant's guilt."  (*Id.* at p. 1530.)  The prosecutor's repeated invocation of " 'one of

you,' " a phrase used 10 times in five sentences, created a risk that a dissenting juror "would decide the case not based on the evidence or the law, but rather find [the] defendant guilty to avoid being viewed as gullible, naïve, or hoodwinked." (*Id.* at p. 1531.) The court reasoned: "We can easily imagine the jury room in which 11 jurors favor guilt and one is undecided…. [T]he 11 would be verbally armed with the prosecutor's weighty accusations of gullibility and naiveté to pressure the holdout. The lone doubter might easily give in to such pressure despite harboring reasonable doubt of defendant's guilt. The result is a juror not participating in the legal system as an independent fact finder in order to avoid appearing gullible and naïve. Such extraneous considerations are … 'rationally and legally irrelevant to the issue of guilt.' " (*Id.* at pp. 1531–1532.)

Here, the prosecutor's comments are not comparable to those in *Sanchez*. He did not target the potential lone holdout juror, nor suggest that a juror who voted to acquit would be gullible, naïve, or a fool. Rather, the prosecutor argued that appellant and the in-custody witnesses presented false testimony as part of a collective effort to mislead the jury into believing appellant was the victim, rather than the perpetrator, of an in-prison assault. "[H]arsh and colorful attacks on the credibility of opposing witnesses are permissible" so long as they are reasonably warranted by the evidence. (*People v. Arias* (1996) 13 Cal.4th 92, 162, italics omitted; see *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [prosecutor may refer to defendant's testimony as " 'lies' " if based on inferences drawn from the evidence].) The record shows the in-custody witnesses were all housed in the same area of Corcoran State Prison and knew appellant by his nickname, indicating a close and friendly relationship. In addition, several correctional officers offered contradictory testimony regarding the June 22 incident, including that D.P. and Rudy J. could not have observed the events through reflections from their respective cells, and that T.A. was not housed at Corcoran State Prison on that date. Thus, the prosecutor's argument that appellant and the in-custody witnesses were attempting to

11.

"play" or deceive the jury fell within the wide latitude afforded prosecutors to vigorously argue their case and make fair comment upon the evidence. (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)

Appellant also claims that the prosecutor's referral to appellant and the in-custody witnesses as "inmate homies" was unduly inflammatory and improperly suggested they lacked credibility because they were prison inmates. " 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.) However, we agree with respondent that the prosecutor's argument—that appellant and his "inmate homies" were attempting to "play" the jurors—was merely "a colloquial attempt to highlight the implausibility of the defense witnesses' testimony." (See *People v. Sandoval* (1992) 4 Cal.4th 155, 180 ["Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence"].) As noted, the prosecutor was entitled to argue that the testimony of appellant and the in-custody witnesses was false and part of a collective effort to cover up appellant's criminal conduct. Further, the prosecutor never stated any witness lacked credibility because he was a prison inmate, but instead properly impeached appellant and the in-custody witnesses with multiple prior convictions involving moral turpitude. (See *People v. Castro* (1985) 38 Cal.3d 301, 314.) To the extent the prosecutor's use of the phrase "inmate homies" suggested appellant and the in-custody witnesses lacked credibility, it was based on their extensive and well-established record of a " 'general readiness to do evil,' " not their status as inmates. (*Ibid.,* italics omitted.) In short, the prosecutor's "harsh and colorful" assertions that the testimony of appellant and the in-custody witnesses was implausible, biased, and lacked credibility were warranted by the evidence, and misconduct did not occur. (*People v. Arias*, *supra*, 13 Cal.4th at p. 162.)

## 2. The prosecutor did not mischaracterize the evidence.

"Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct. [Citations.] A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' " (*People v. Hill* (1998) 17 Cal.4th 800, 823.) Likewise, a prosector "may not assume or state facts not in evidence." (*People v. Valdez* (2004) 32 Cal.4th 73, 133.)

Appellant claims the prosecutor mischaracterized the evidence during closing argument in several different ways. He first argues there was no evidentiary support for the prosecutor's assertion that appellant and the in-custody witnesses " 'have made a profession out of trying to game the system.' " We disagree. The record reflects that appellant and the in-custody witnesses sustained numerous prior convictions, including attempted murder, robbery, rape, and in-prison assaults. While appellant emphasizes that none of these convictions were for "fraud-type crimes," most involved moral turpitude, that is, a " 'readiness to do evil.' " (*People v. Castro*, *supra*, 18 Cal.3d at p. 314, italics omitted.) Given their extensive criminal history and the nature of those offenses, the prosecutor's generalized assertion that they had a history of attempting to "game the system" was a fair comment on the evidence.

Next, appellant asserts there was no evidentiary basis for the prosecutor's assertion that appellant and the in-custody witnesses "know [appellant] is guilty," and argues the statement amounted to an improper expression of personal belief in appellant's guilt. (See *People v. Sandoval*, *supra*, 4 Cal.4th at p. 183 [prosecutor may not express a personal belief in the defendant's guilt].) As discussed, the prosecutor's argument that appellant and the in-custody witnesses sought to deceive the jury into viewing appellant as the victim, rather than the perpetrator, was supported by the evidence. From that premise, the prosecutor could reasonably argue that a knowing attempt to mislead the jury reflected an awareness of appellant's culpability. Thus, the argument was a

permissible inference drawn from the evidence, not an expression of personal belief in appellant's guilt.

Lastly, appellant contends the prosecutor mischaracterized the evidence by asserting that appellant was the only witness to testify there " 'was something that could be done to retrieve the blade' " from the plumbing system. He argues this was misleading because Jaime A. indicated there was a shutdown procedure that could be used to stop the water and recover contraband.

Appellant's claim rests on an unduly literal interpretation of the prosecutor's remarks. While Jaime A. acknowledged the existence of a shutdown mechanism, he made clear it was not a practicable option in these circumstances because there was no time to implement it after the item was flushed. In context, the prosecutor's argument—that appellant alone claimed officers had a usable means to recover the item and chose not to do so—was a fair characterization of the evidence. Accordingly, the prosecutor did not misstate or mischaracterize the evidence during closing argument, and this claim fails.

### 3. The prosecutor did not disparage defense counsel.

Appellant claims the prosecutor improperly suggested to the jury that defense counsel fabricated a defense and knew appellant was guilty. He relies on the following remarks from the prosecutor's closing argument:

> "And, now, I'm going to address the evidence that the defense put on and I'm going to try to explain to you why their conspired -- their collective lie or story is so ridiculous. The very fact that they would go to the length to try to present that to you is actually further evidence that they know [appellant] is guilty and that they are putting forth that story to try to play you."

In appellant's view, the prosecutor's reference to "the defense" necessarily included defense counsel, thereby suggesting counsel knew appellant was guilty and presented a " 'collective lie' " to mislead the jury.

"It is misconduct for the prosecutor in argument to impugn the integrity of defense counsel or to suggest defense counsel has fabricated a defense." (*People v. Cash* (2002) 28 Cal.4th 703, 732.) Considered in context, however, it is apparent that the prosecutor's remarks were directed at appellant and the in-custody witnesses, not defense counsel. As previously discussed, the prosecutor was permitted on this record to argue that appellant and the defense witnesses lacked credibility and had fabricated their testimony, and he consistently advanced that position during closing argument. The prosecutor made no other comments that even remotely suggested defense counsel was aware of appellant's guilt or fabricated a defense and even went out of his way to compliment defense counsel during rebuttal.[3] Given this context, there is no " ' "reasonable likelihood that the jury construed" ' " the prosecutor's references to "the defense" as an attack on the integrity of defense counsel. (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 305.) We therefore conclude the prosecutor did not commit misconduct, and this claim is without merit.[4]

## II. Section 1385, Subdivision (c) Is Inapplicable to Appellant's Prior Strike Convictions. Sentencing Error Did Not Occur, and Defense Counsel Was Not Ineffective for Failing to Request Dismissal on This Basis.

Appellant claims the trial court erred by failing to dismiss all but one of his prior strike convictions at sentencing pursuant to section 1385, subdivision (c). He acknowledges that defense counsel did not request dismissal on this ground, but argues that forfeiture is inapplicable because his sentence is unauthorized. According to appellant, dismissal is mandatory where the mitigating circumstances in section 1385, subdivisions (c)(2)(B) and (c)(2)(C) are present, and therefore imposition of the

---

[3] Specifically, the prosecutor stated: "I have a lot of respect for [defense] counsel. I think he's a scholar and a gentleman."

[4] Because we conclude the prosecutorial misconduct did not occur, we necessarily reject appellant's assertion that the alleged misconduct violated his federal constitutional rights to due process and a fair trial.

"enhancements" was unlawful.  In the alternative, appellant contends counsel's failure to request such dismissal constituted ineffective assistance.

We need not consider the issues of forfeiture or ineffective assistance of counsel because "section 1385, subdivision (c)'s provisions regarding enhancements do not apply to the Three Strikes law."  (*People v. Burke* (2023) 89 Cal.App.5th 237, 244 (*Burke*).)  Consequently, the claim is without merit.

**A.      *Applicable law – section 1385, subdivision (c).***

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81) amended section 1385 to add subdivision (c) (Stats. 2021, ch. 721, § 1), which provides, in part:

> "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

> "(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the [listed] mitigating circumstances … are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(1)–(2).)

Appellant claims the following enumerated mitigating circumstances listed in section 1385, subdivision (c) are applicable here and warranted dismissal of at least two of his prior strike convictions: section 1385, subdivision (c)(2)(B) provides:  "Multiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed;" section 1385, subdivision (c)(2)(C) provides:  "The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed." (§ 1385, subds. (c)(2)(B), (c)(2)(C), added by Stats. 2021, ch.721, § 1.)

**B.** *Section 1385, subdivision (c) does not apply to prior strike convictions.*

Following the enactment of Senate Bill 81, courts have uniformly concluded that section 1385, subdivision (c) does not apply to prior strike convictions. Despite this, appellant contends the plain language of the statute and its legislative history support a contrary interpretation. We disagree.

In *Burke,* the court explained that the plain language of section 1385, subdivision (c), expressly applies to dismissal of an "enhancement." (*Burke*, *supra*, 89 Cal.App.5th at p. 243.) "The term 'enhancement' has a well-established technical meaning in California law. [Citation.] 'A sentence enhancement is "an additional term of imprisonment added to the base term." ' " (*Ibid.*) By contrast, "the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense." (*Ibid.*; citing *Romero*, *supra*, 13 Cal.4th at p. 527 [the Three Strikes law "articulates an alternative sentencing scheme for the current offense rather than an enhancement"]; *People v. Williams* (2014) 227 Cal.App.4th 733, 744.) *Burke* reasoned the Legislature was presumptively aware of this distinction and did not otherwise define the term "enhancement" in section 1385. (*Burke*, at p. 243; see *People v. Escobar* (1992) 3 Cal.4th 740, 750 [when the Legislature amends a statute without disturbing a settled judicial interpretation of its operative language, courts presume the Legislature has ratified that interpretation].) Because "the statutory language is clear and unambiguous," the plain meaning controls. (*Burke*, at p. 243, citing *People v. Canty* (2004) 32 Cal.4th 1266, 1276 ["If the language is clear and unambiguous, we follow the plain meaning"].) *Burke* therefore concluded "section 1385, subdivision (c)'s provisions regarding enhancements do not apply to the Three Strikes law." (*Burke*, at p. 244.)

Since *Burke*, every published opinion that has considered whether section 1385, subdivision (c) applies to prior strike convictions has reached the same conclusion. (*People v. Grandberry* (2026) 118 Cal.App.5th 14, 18–19; *People v. Dain* (2025) 115 Cal.App.5th 235, 247; *People v. Dowdy* (2024) 107 Cal.App.5th 1, 9–10; *People v.*;

17.

*People v. Olay* (2023) 98 Cal.App.5th 60, 64; see also *McDowell* (2024) 99 Cal.App.5th 1147, 1154 [§ 1385, subd. (c) inapplicable to alternative penalty provision of § 236.1, subd. (c)(2)].) We join these well-reasoned authorities. By its plain language, the statute only applies to "enhancements," and the Three Strikes law is an alternative sentencing scheme, not an enhancement. Because the statutory language is clear and unambiguous, we need not consider the legislative history cited by appellant. (See *Green v. State of California (*2007) 42 Cal.4th 254, 260 ["If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent"]; *Burke*, *supra*, 89 Cal.App.5th at p. 243 [declining to consider legislative history of § 1385, subd. (c) because there is no ambiguity in its plain language].) Indeed, "If the Legislature had wanted section 1385, subdivision (c) to apply to prior strikes as well as to enhancements as legally defined, it would have said so." (*Olay*, at p. 67.)

Appellant contends *Burke* and its progeny were wrongly decided. He argues that the imposition of a 25 years to life sentence based on multiple prior strike convictions is an "enhancement" because it is "an additional term of imprisonment applied to the base term" that "increases the sentence way above the determinate term that would [otherwise] be imposed." Appellant misapprehends the distinction between a sentence enhancement and an alternative sentencing scheme. The Three Strikes law "is not an enhancement because it does not add an additional term of imprisonment to the base term. Instead, it provides for an alternate sentence (25 years to life) when it is proven that the defendant has suffered at least two prior serious felony convictions." (*People v. Williams*, *supra*, 227 Cal.App.4th at p. 744.) Adoption of appellant's interpretation would ignore the "well-established technical meaning" of these terms. (See *Burke*, *supra*, 89 Cal.App.5th at p. 243.)

Appellant also claims that the statutory language of the Three Strikes law demonstrates that prior strike convictions are sentence enhancements. He relies on section 667, subdivision (e), which states that the law's alternative penalties apply "in

addition to any other enhancement or punishment provisions." But this language merely confirms that a three strikes sentence is imposed cumulatively with other enhancements or punishment provisions. (See *People v. Williams* (2004) 34 Cal.4th 397, 403–404.) Appellant also invokes section 667, subdivision (d)(3), which provides that "[a] prior juvenile adjudication constitutes a prior serious or violent felony conviction for purposes of sentence enhancement" if specified conditions are satisfied. In context, however, the reference to "sentence enhancement" pertains to the imposition of an increased, alternative sentence under the three strikes scheme. Neither provision suggests that a prior strike conviction constitutes a sentence enhancement, and nothing in the statutory language indicates otherwise.

Consistent with the overwhelming weight of authority, we conclude section 1385, subdivision (c) does not apply to prior strike convictions. Because the trial court had no basis to dismiss the prior strike convictions on this ground, sentencing error did not occur, and counsel's failure to pursue such relief did not constitute ineffective assistance. The claim is without merit.[5]

## DISPOSITION

The judgment is affirmed.

---

[5] Because we conclude appellant was properly sentenced, we necessarily reject his claim that the trial court's failure to dismiss his prior strike convictions violated his right to due process.

LEVY, Acting P. J.

WE CONCUR:


DETJEN, J.


MEEHAN, J.